PARKYN v. FORD.

1. CANCELLATION OF INSTRUMENTS—FRAUD—AFFIRMANCE—WAIVER.
   In proceedings for the cancellation of a deed to a farm on
   the ground of fraud, where complainant and defendant
   exchanged farms, complainant also purchasing defend-
   ant's personalty, and the evidence shows that the com-
   plainant, who was much above the average in intelligence,
   had lived on the farm for 3½ months, and had ample op-
   portunity to discover the fraud, if any, when he signed
   a receipt purporting to be "a full, complete compromise
   settlement of any and all differences on land and other
   trades," *held*, an affirmance of the trade and waiver of
   the right to complain of fraud.

ON APPLICATION FOR REHEARING.

2. PRINCIPAL AND AGENT—AUTHORITY OF AGENT—EQUITIES.
   Where complainant A. was represented by her brother-in-
   law, another complainant, throughout the transactions, in
   which their interests were closely allied, and she acqui-
   esced in his acts, *held*, unnecessary to separate her equities
   from his, and that he had authority to bind her.

Appeal from Hillsdale; Knowlen, J., presiding. Sub-
mitted April 18, 1916. (Docket No. 29.) Decided
December 21, 1916. Rehearing denied May 31, 1917.

Bill by Joseph O. Parkyn and others against Julius
C. Ford for the rescission of an exchange of real estate
on the ground of fraud. From a decree for complain-
ants, defendant appeals. Reversed, and bill dismissed.

*F. A. Lyon,* for complainants.

*W. H. Frankhauser* (*Shields & Silsbee,* of counsel),
for defendant.

BIRD, J. Plaintiffs were the owners of 93 acres of
farm lands lying near the city of Hillsdale. Defend-
ant, at the same time, was the owner of a farm of 288

acres, situate near Summit, in the State of Mississippi. Defendant advertised his farm for sale, and the advertisement came to the attention of plaintiff Joseph O. Parkyn, and he wrote to defendant, making numerous inquiries concerning the farm. These inquiries were replied to by defendant, and further correspondence was had, but nothing came of it. A few months later the correspondence was renewed by Parkyn, and several letters passed between them, looking toward an exchange of farms. In his letters defendant invited plaintiff to come to Mississippi and inspect the farm for himself. He did so. He remained in Summit two days, and after looking the farm over and talking with some of the near neighbors, he left Summit, with the understanding that he would return home and talk the matter over with his family and advise him what conclusion they reached. A few days later he made the following proposition by letter for an exchange of the properties:

"HILLSDALE, MICH., 2/24/1913.

"J. C. FORD,
　"Summit, Miss. .
　*"Kind Friend:* I arrived safe in Hillsdale last evening and have spent the morning in attempting to tell my family of the advantages and disadvantages of your section of Mississippi and of those specially applicable to the Ford farm, and having reached the conclusion that we can venture to make the change I submit the inclosed proposition for your consideration, which is the best offer I can make.

　　"Proposition for Exchange of Farms.
"Mr. J. C. FORD,
　"Summit, Miss.
　"I will exchange my two farms lying within the city limits of Hillsdale, Mich., containing about 93 acres for your farm in Pike county, Miss., containing 288 acres, more or less, already visited and inspected by me Feb. 20-21, 1913. You are to assume the mortgages now on these farms amounting, accrued interest included, to $3,544, and I am to give you a mortgage

on the farm taken of you in exchange for my farm to the same amount, viz., $3,544, said mortgage to draw 6 per cent. annual interest, I should like the note this mortgage secures made payable five years after date with the privilege of paying $100.00 or any multiple at any annual interest payment, or have the note drawn payable on or before five years after date.

"If we can agree upon the amount to be paid for them, I will purchase your sows, pigs, mules, wagon, drill, other farm implements, hay and grain. As regards the exchange proposition you will readily understand this amounts to an even exchange, as I neither increase nor diminish my indebtedness, simply have it transferred."

Upon receipt of this proposal defendant came to Hillsdale and inspected plaintiff's premises. He appeared to be well pleased with them and accepted plaintiff's proposition, save in this respect: He retained a half interest in certain gravel pits on the Mississippi farm. The value of the personal property mentioned in plaintiff's proposal was agreed upon, and plaintiff purchased it, agreeing to pay therefor $1,500. Conveyances of the real estate were exchanged on the 11th day of March, 1913. Following this defendant went into possession of the Hillsdale lands, and plaintiff and his family went to Mississippi and took possession of the Mississippi farm. Plaintiff and his family lived there from April until September, 1913, when Parkyn came north and commenced these proceedings in the Hillsdale circuit court, praying for a rescission of the entire transaction relative to the exchange of real estate, upon the ground that defendant had made false and fraudulent statements concerning the Mississippi farm. The misrepresentations referred to, and which were relied upon at the hearing, were five: *First*, that said farm was worth in the open or general market, $47.50 per acre; *second*, that there were no insects of any kind in the locality, except the cotton boll weevil that were worrying the farmer in that

section; *third,* that the gravel pits on said farm held the only available gravel in that locality; *fourth,* that defendant had raised on the field south of the barn the preceding year of 1912, 60 bushels of shelled corn per acre, without fertilization; *fifth,* that there was no overflow from the river, except a small overflow now and then in the timber. The defendant denied that he was guilty of any fraud in connection with the trade. Much testimony was taken bearing upon the charges made by complainant, and at the conclusion thereof the chancellor was of the opinion that complainant was entitled to relief upon the third, fourth, and fifth allegations, but denied relief as to the first and second. Defendant appeals from the decree.

Counsel have discussed, in oral argument and in briefs, each one of the five propositions involved, and their presentation of them has been very helpful to the court in reaching a conclusion. Our view of the case, however, will make it necessary to discuss only one phase of the case.

The record shows that both Parkyn and Ford were men abundantly able to take care of themselves in a business deal. Each took the precaution before trading to examine the other's premises. After exchanging, plaintiff went to Mississippi in April with his family, and remained on the farm until September. On July 12th of that year plaintiff and defendant had a settlement, in which defendant allowed plaintiff $160 on his note for a shortage in the personal property which he had sold him. At that time the following receipt was signed by plaintiff:

"Received of J. C. Ford, $160 credit on a note, dated March 11, 1913, for $400, due March 11, 1914, as itemized above, which is a full, complete compromise settlement of any and all differences on land and other trades, as per contract between us."

At the time plaintiff signed this receipt he made no

complaint that he had been overreached in the deal, although he had then been in possession of the farm for nearly 3½ months. No such complaint had been made by him prior to July 12th, and no complaint was made by him after that date, and before he came north in September, notwithstanding defendant lived at Summit, only a few miles distant from him. In fact, plaintiff never complained to defendant about the falsity of his representations until he filed his bill in this case, although they appeared to be on friendly terms during all that time.

While it does not appear at what precise time plaintiff discovered that he had been defrauded, we assume that a man of his mental caliber had ample opportunity, in the three months he lived on the farm before signing the receipt in question, to learn the selling value of the farm; to learn of the insects which infested the locality; to inform himself as to the value of the gravel pits; and to discover the fertility and productiveness of the soil. The extent to which the farm was overflowed by high water was known to him because of a freshet which occurred in June. If he knew, or had ample opportunity to know (*Lee v. McClelland,* 120 Cal. 147 [52 Pac. 300]; *State Bank of Iowa Falls v. Brown,* 142 Iowa, 190 [119 N. W. 81, 134 Am. St. Rep. 412]), that defendant's representations were untrue when he signed the receipt on July 12th and made no complaint nor protest, we think by so doing he affirmed the trade and waived his right to complain of the fraud (39 Cyc. p. 1292, and cases cited). .

The plaintiff was, at the time of the deal, about 60 years of age, much above the average in intelligence, with a varied experience, and thoroughly familiar with the business of farming. His letter to defendant, making inquiry about the farm, shows much better than we can state the quality of his mind. It follows:

"*Dear Sir:* Your favor of the 22d inst. received and in reply will say that your brief description of your farm in Miss. interests me and arouses my curiosity to a degree which induces me to write for further particulars. Kindly inform me in what county it is located, its distance from the Gulf, amount in acreage, and variety of timber, if any, growing upon the portion not under cultivation. I desire to know also if the farm is suitable for dairy purposes, of the grasses for hay and pasturage growing upon the same. A more complete description of the house with its location and surroundings would interest me, by this, I mean number of rooms on first and second floors, dimensions of the rooms as well as the ground space occupied by it, its distance from the road and frontage on same, also if water for house use is convenient, and if obtained from well or spring, and if water is hard or soft, whether there are porches, etc. How about shade trees, fruit trees and varieties? Any small fruits? How much (in acres) is suitable for the production of alfalfa? Is the land free from stone or rock, if you have well or wells of water kindly state depth of same, is your soil what is called Orangeburg sand or sandy loam? Are fish plentiful in the river and stream given as partial boundaries of the farm? Is your farm tract fenced and with what, have you any paper shell pecan trees, what game in the woods and is it abundant, are neighbors near, state if labor is to be easily had or hard to find, whether white or colored? Of what denomination is the church which is nearby? Kindly tell me if the house faces a north and south or an east and west road and on which side of the road, also if house is of one, two or more stories in height, any cellar under house? How large a barn on farm and is farm divided into fenced fields? \* \* \* A few more questions and I will cease imposing on your good nature, believing that in such a serious matter as changing locations, forming new associations and entering upon entirely different conditions you will readily pardon me for seeking advance information. What kind of public roads have you, what is the rate of taxation per $1,000? Can you quote me lumber prices, coal prices, transportation facilities, cost of farm labor, of cows, horses, mules and poultry? Is much attention given to truck and fruit growing,

dairying, stock raising, and to the growing of poultry, any stone for building purposes, cost of cement and building materials? What are your staple crops and what special crops are well adapted to the soil of your farm, are commercial fertilizers needed upon it? Assuring you in advance that I shall appreciate any information you may be able to supply me and hoping soon to form your acquaintance, I am,

"Very truly yours,
"J. O. PARKYN.

"P. S.—As a woman usually writes a postscript, I represent my wife in asking about climatic conditions. Kindly give me extremes of heat and cold for the seasons, if available, for your neighborhood, annual rainfall and how distributed, whether subject to violent or sudden storms or not, how about prevailing winds and sudden changes in temperature. Any mosquitos or poisonous insects or reptiles, any fleas, cockroaches, or insect pests? Is any portion of your farm subject to or liable to overflow from the river or creek, can you give me name of river on boundary, also of the city near farm. J. O. P.

"P. S.—Can you give size of the tenant houses and condition of same, are houses and barn new or old, in good condition or not?—J. O. P."

It is asking rather too much of this court to believe that plaintiff, with the inquisitive mind that this letter shows him to be possessed of, could live on a farm which he had acquired for more than three months without verifying the truth of the representations of which he now complains, because investigation and research are the natural accompaniments of the inquisitive mind.

But it is said that the receipt has to do with the personal property which plaintiff purchased, and that he is asking no relief from that contract, and, further, that his accepting credit on his note would not affect the contract relating to the real estate. Upon the question of plaintiff's right to a rescission of the contract it would doubtless become important whether the contract for the personal property was severable from

the real estate agreement, inasmuch as he did not tender back the personal property before bringing suit, but upon the question of the affirmation of the entire transaction it is not controlling in view of the wording of the receipt. It is evident that the parties had something else in mind beside the personal property, as it referred to "all differences on land and other trades."

2. The fact that plaintiff made no complaint of the misrepresentations from April to September, considered in connection with certain testimony given by plaintiff and members of his family, is very suggestive that there were other reasons for desiring a rescission of the conveyances. The plaintiff testified that the climate had an enervating effect on him; that he lost flesh rapidly as the hot weather came on, and that he found he was unable to stand much labor in the sun; that as a result of this his health failed rapidly, and that he grew weaker as the summer wore on; that he finally reached a point where he could do no manual labor. Plaintiff's son testified in his deposition that his father was pleased with the looks of the place. In fact he was well pleased until he went back to Hillsdale and saw the town improving. The daughter, being interrogated along the same lines, testified that she did not want to come down here, that she wanted to go back now, and that the whole family was in that temper, and had been for a couple of months or longer. But whatever may have been the reason for desiring a rescission of the deeds, we are of the opinion that plaintiff's conduct in signing the receipt after he had ample opportunity to discover the falsity of the representations, if there were any, without making any protest, precludes any relief in his behalf.

The decree of the trial court is reversed, and plaintiff's bill dismissed, with costs of both courts to defendant.

STONE, C. J., and KUHN, OSTRANDER, MOORE, STEERE, and BROOKE, JJ., concurred. PERSON, J., did not sit.

## ON APPLICATION FOR REHEARING.

BIRD, J. Application has been made for a rehearing in this cause, and the principal point raised in support thereof is the failure of the court to pass upon the equities of plaintiff Anna M. Adams. No separate mention was made of her equities in the opinion because it appeared that her interest was so closely allied with the interest of the other plaintiffs that it would be unnecessary. Miss Adams is a sister of Mrs. Parkyn, is a member of the Parkyn family, and went with them to the Mississippi farm to reside. A fair inference from the testimony shows that her brother-in-law, Parkyn, acted for her throughout the negotiations, and represented her interest, whatever it was, when the trade was made, and continued to represent her interest while on the Mississippi farm. So far as the record shows, she appears to have acquiesced in her brother-in-law's acts as fully as Mrs. Parkyn did. Our conclusion is that plaintiff Parkyn had authority to bind her in the transactions.

Rehearing is denied.

KUHN, C. J., and STONE, OSTRANDER, MOORE, STEERE, and BROOKE, JJ., concurred. FELLOWS, J., did not sit.